COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, Malveaux and Senior Judge Annunziata
Argued at Alexandria, Virginia

DILSHAD SABRI DOSKY

MEMORANDUM OPINION* BY
v.      Record No. 1771-17-4      JUDGE MARY BENNETT MALVEAUX
AUGUST 13, 2019

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Robert J. Smith, Judge

Joseph D. King (King, Campbell & Poretz, PLLC, on briefs), for
appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Dilshad Sabri Dosky ("appellant") was convicted of first-degree murder, in violation of

Code § 18.2-32. On appeal, he argues the trial court erred by: (1) refusing to allow a defense

witness to testify that the victim had assaulted and robbed him, (2) refusing to allow character

evidence that the victim had a reputation for bullying and robbing; (3) allowing the Commonwealth

to impeach its own witness; (4) denying his motion for mistrial due to juror bias established by

extraneous juror contacts; (5) denying his motion to set aside the verdict due to juror bias

established by a post-trial LinkedIn message sent to the Commonwealth by a juror; (6) refusing his

proffered involuntary manslaughter instruction; and (7) allowing the Commonwealth to introduce

irrelevant portions of an interrogation video. For the following reasons, we affirm.

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

"In accordance with established principles of appellate review, we state the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court[, and] accord the Commonwealth the benefit of all inferences fairly deducible from the evidence." Riner v. Commonwealth, 268 Va. 296, 303 (2004).

### The Commonwealth's Evidence

On the morning of February 10, 2016, Tyrice Byrd was at appellant's house and heard appellant and Shaki Phillip, the victim in the case, arguing on the phone. Appellant sounded "mad."

That same morning, Javier Castedo received a call from Byrd, asking for a ride to purchase marijuana. Castedo agreed and drove to appellant's home, where he picked up Byrd and appellant. At first, Byrd did not say where he wanted Castedo to take them, but eventually Castedo learned that they wanted to go to the victim's house. Appellant's demeanor during the drive was "a little anxious," "really riled up," "angry," and "not really coherent." Appellant said "nobody could tell him what to do," and Castedo "could just tell that he was talking about the guy that we were going to [see]." Byrd sent the victim text messages and spoke to him by phone several times during the drive.

When they arrived at the victim's residence, they waited for the victim to come out. During this time, appellant said that he did not want to pay the victim back and was "complaining" about the victim "always . . . bothering him about something." Appellant's tone was "aggressive and . . . pretty harsh."

When the victim approached the car, both appellant and Byrd initially got out of the car, but then appellant got back into the car. Castedo remained in the car and watched them through the rearview mirror. Byrd bought marijuana from the victim. After this exchange, Byrd got

back into the car and appellant got out, and the victim and appellant went to the back of the car to talk.

Castedo heard the two "talk about money" and the victim yell at appellant that "he didn't want to deal with [him]." According to Castedo, appellant's tone was "aggressive and loud," and the victim was "also in a bad mood but it wasn't as loud and aggressive." Castedo felt his "car shake like something had bumped into it," and looked out to see appellant and the victim "scuffling." According to Byrd, the two men had initially engaged in a calm conversation, but it got louder and then the two "were arguing and they started fighting." Byrd did not see who threw the first punch.

The two scuffled next to the car for twenty or thirty seconds before the victim ran up the street toward his house. When the victim started to run, Castedo saw a rip in the torso of his jacket and noticed feathers blowing out of the jacket. Appellant ran after the victim, and Castedo lost sight of them once they got to the side of the victim's home.

A minute or two later, appellant jogged back to the car. He seemed "really nervous" and had a cut on his right shin and cuts on his hands. Castedo had not previously noticed these injuries. Byrd also saw appellant holding his hand like he "might have hurt it or something" when he got back to the car. Appellant told Byrd and Castedo that he did not know what had happened, and he was "freaking out . . . saying that [the victim] might come back after him . . . to get some sort of revenge." He stated that "the police were probably going to come after him." Appellant also stated that he did not know "if [he] got him" and that he needed a gun to protect himself. He told Castedo and Byrd not to say anything to the police. Appellant did not tell them that the victim had choked him or had put his hands around his neck in any way.

Castedo drove Byrd and appellant back to appellant's house and left shortly thereafter. About thirty minutes after Byrd and appellant arrived at appellant's house, appellant gave Byrd a

- 3 -

pocketknife. He did not say anything to Byrd when he gave him the knife, and Byrd did not know why appellant gave it to him. Appellant told Byrd that he was "going to a park or something" and left his home. Byrd had not known appellant to carry a pocketknife.

Sheryah Phillip, the victim's sister, testified that while she was at home with her brother on the morning of February 10, 2016, she observed him arguing with someone over the phone. During this argument, the victim spoke in an "aggressive" manner and appeared "frustrated." About thirty minutes after the argument, the victim left the house. Five minutes later, Phillip saw the victim run back up the driveway with appellant chasing him. She described appellant as "aggressively running after" the victim, who was about four or five feet in front of appellant. The victim and appellant were running toward the back of the house, so Phillip opened the back door. When she did so, she saw the victim at the back door with his neck "gushing blood." Appellant was two or three feet behind him holding a knife in his hand. Phillip saw blood on the knife as well as blood on appellant's hand where he was holding the knife. Phillip told appellant to leave the property, and he left jogging toward the front of the house. Phillip called 911 and then attempted to stop the victim's bleeding, but he later died as a result of his injury.

Monica Hill, the girlfriend of the victim's father, was also present the morning of the victim's death. She saw the victim leave the house through the front door, and then saw him "running at top speed up the driveway" with appellant following two to three feet behind him. Hill went into the kitchen, saw the victim enter through the back door, and heard him say, "I'm dead. I'm dead."

Detective Chad Mahoney of the Fairfax County Police Department was given a description of appellant and found him on a street near his home. When Mahoney, who was wearing a ballistic vest and jacket labelled "police," approached appellant and asked if he could speak with him, appellant replied, "Who, me?" Mahoney responded "yes" and told appellant to

take his hands out of his pockets. Appellant fled briefly before he stopped and put up his hands. Mahoney observed cuts on appellant's hands and blood on his palms and his shorts.

A few minutes later, Mahoney came into contact with Byrd and also arrested him. When asked if he had any weapons on him, Byrd told Mahoney that he had a knife that his friend had just given him.

After his arrest, appellant was taken to the hospital to receive medical treatment for an injury to his right shin. While there, appellant asked a police officer "what would happen if someone committed a very bad crime and before the police found out about it they left the country?" The officer responded that she could not really answer the question, and appellant then asked, "[W]hat would happen if they fled to Iraq?"

Dr. Jocelyn Posthumus, the medical examiner who conducted the autopsy on the victim, testified that the victim died from an incised wound to the neck. She explained that in contrast to a stab wound, which is deeper than it is long, an incised wound is longer than it is deep. She also stated that an incised wound is a "sharp force injury" which occurs as a result of "a cross motion like a slash." Dr. Posthumus testified that the victim's incised wound was four and a half inches long and approximately two inches deep. The wound "transected major blood vessels in [the victim's] neck which ultimately resulted in [his] death."

Dr. Posthumus also testified that the victim had an incised wound to the right side of the chest, as well as an incised wound on his left wrist forearm that was approximately half an inch deep. She stated that incised wounds on the extremities are defensive wounds that "occur when the person is trying to defend himself" and protect "more vital areas" such as the head and chest. She noted that the victim also had small abrasions on his right hand and left elbow.

Dr. Posthumus further testified that an individual being strangled would lose consciousness after about two minutes. She also agreed that a person in the process of being strangled may have "a very frightening sensation . . . of loss of air."

Detective Craig Guyton of the Fairfax County Police Department, the lead investigator in the case, interviewed appellant at around 8:00 p.m. on the night of the victim's death. During the interview, appellant first denied that he had gone to the victim's home. He also denied that he had "scuffle[d]" with the victim and stated that the victim was "[his] boy." When Guyton challenged the truth of appellant's statements, appellant said that the victim had invited him over by text message. When asked if police could see the text messages, appellant said that he had deleted them. Appellant then claimed that he, Castedo, and Byrd had gone to the victim's home, and when they arrived the victim had come out to Castedo's car and spoken to them, and then the victim went back into the house.

After interviewing appellant for about twenty minutes, Guyton told appellant that the victim had died. Appellant said that he did not believe it, a statement which he repeated many times during the interview. Appellant also repeatedly stated that while he and the victim had argued, they had not scuffled or had a physical altercation. When Guyton told appellant he would be charged with murder, appellant replied that he would never have put a hand on the victim. Appellant also denied that he had stabbed the victim, that he had a knife that day or ever carried a knife, or that he gave Byrd a knife. He suggested that any knife found by police would have been one of his mother's cooking knives and should be tested for fingerprints.

Appellant admitted to Guyton that he had owed the victim money. He said the victim was "always" threatening him about his debts, even though appellant repaid him. At one point, appellant stated that he would not have stabbed or shot the victim unless the victim had stabbed or shot appellant first. He then stated that the victim had not stabbed him that day.

- 6 -

Around 8:50 p.m., Detective Guyton left the interview room for about forty minutes. When Guyton returned, appellant told him that he was being blamed for the victim's death merely because he had talked to the victim outside the car. He also suggested that his friends were not being truthful because they had been caught with the knife. Appellant again stated that he and the victim had not fought and that he had not had a knife.

Appellant never told the detective that the victim had strangled, choked, or grabbed his neck in any way.

After the interview, Guyton recorded a ten-minute conversation he had with appellant while driving him to see a magistrate. Appellant asked how long people "got locked for" in "a situation like this." Appellant also asked, "If I say I did it, what will happen to me?"

Police found "white feather or down-like material" and blood stains along the driveway outside the victim's home. Sheryah Phillip's car was parked in front of the home and there was blood on the fender which "continue[d] down the side of the car." There were also blood stains on the concrete near Phillip's car, and blood was found on the walkway leading to and from the back door of the victim's home. There were multiple cuts in the victim's down vest that he was wearing at the time of the incident, including a cut on the collar that was consistent with the location of his neck injury. The knife recovered from Byrd still had the victim's blood on it as well as feathers from his vest stuck to it.

During a search of appellant's home on the day of the victim's death, police observed what appeared to be blood on the sliding glass door to the basement and on stairs within the home. Police also found boxer and gym shorts that appeared to have blood on them in the bathroom, and a pair of jeans that appeared to have blood stains on the knees in appellant's bedroom. In the basement, the police recovered a pink dishrag that appeared to have blood on it and a "black and white coat" with blood stains. Forensic testing was not conducted on the

boxers, gym shorts, jeans, or dishrag, but testing revealed that the coat had appellant's, but not the victim's, blood on it. Detective Guyton testified that appellant may not have gotten the victim's blood on his person because the blood was "capture[d] underneath the jacket that [the victim] was wearing."

## Appellant's Testimony

Appellant testified in his own defense. Regarding the incident that led to the victim's death, appellant testified that when he was behind Castedo's car with the victim, the victim asked appellant about the money he believed appellant owed him. Appellant told him that he did not owe him any money, at which point the victim "got in his face," was mad, and asked if he had any money on him. Appellant responded that it did not matter if he had any money because he did not owe any money to the victim. According to appellant, when he said that, the victim "exploded" and started punching appellant. Appellant stated that when the victim started punching him, he put his hands up to protect his face, and then the victim pushed him and he hit the back of the car. The victim then grabbed appellant's throat with both his hands and started to choke him. Appellant stated that the victim was "crushing [his] throat" and that he could not breathe and thought he was going to die. Appellant stated that he placed his hands on the victim's forearms to try to take the victim's hands off of him but was unable to remove the victim's hands from his neck. At that point, he reached into his pocket and retrieved his pocketknife. He slashed the knife at the victim in an attempt to get the victim off of him. Appellant knew the victim "must have been injured," but did not know that the victim "was seriously hurt." Appellant claimed that he did not intend to cut the victim's throat. When appellant later saw the autopsy report, he testified that he knew "the cause of death . . . was going to be problematic."

The jury convicted appellant of first-degree murder. Appellant filed a motion for a new trial, which the court denied. This appeal followed.

## II. ANALYSIS

### A. Evidentiary Issues

Appellant challenges the exclusion and admission of various evidence: the exclusion of testimony regarding a previous act of violence committed by the victim; the exclusion of testimony that the victim had a reputation for "bullying and robbing"; the admission of testimony that appellant stated "[t]ell him we're coming, tell him we're coming" on the way to the victim's home; and the admission of portions of an interrogation video. Applying the standards for harmless error review, we conclude that any error in the exclusion or admission of this evidence did not affect the jury's verdict and was thus harmless.

As appellant alleges evidentiary errors, we conduct our inquiry under the standard for non-constitutional harmless error. Salahuddin v. Commonwealth, 67 Va. App. 190, 211-12 (2017). Under that standard, any error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. Further, "[i]f other evidence of guilt is so overwhelming and the error insignificant, by comparison, supporting a conclusion that the error did not have a substantial effect on the verdict, the error is harmless." Angel v. Commonwealth, 281 Va. 248, 268 (2011). "An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." Campos v. Commonwealth, 67 Va. App. 690, 717 (2017) (quoting Lavinder v. Commonwealth, 12 Va. App. 1003, 1006 (1991) (*en banc*)). The appellate court must "examin[e] the excluded evidence in light of the entire record." Commonwealth v. Proffitt, 292 Va. 626, 642 (2016).

<u>Previous Acts of Violence / Reputation Evidence</u>[1]

At trial, Sheryah Phillips, the victim's sister, was also called as a witness for the defense. She testified that the victim had been charged with assault in August 2015 after he hit her in the face which resulted in her having a black eye. She stated that the incident had occurred after the victim threw a brownie at her and she bit him on his arm. Phillips testified that it was not uncommon for her to "roughhouse[]" with her brother. Mubshra Ali also testified for the defense. She stated that in August 2014, four teenagers, including the victim, broke into her home and robbed her. She testified that the victim had kicked open the door and used a taser on her eleven-year-old son during the robbery. She said that when she later saw the victim at the courthouse, he was "really rude and he wasn't sorry."

During trial, the Commonwealth filed a motion to exclude testimony by Martin Samey about another previous act of violence by the victim—that in February 2015 Samey had arranged to buy marijuana from the victim, but instead of selling him marijuana the victim had ambushed and robbed him. The Commonwealth argued that Samey's testimony would present a "sanitized and extremely misleading version of events" because he would testify that he was attacked by the victim, but would not be permitted to testify that the attack occurred in the context of a drug transaction. The Commonwealth further argued that it would be unable to fully and fairly cross-examine Samey without violating the pretrial ruling prohibiting discussion of the victim's prior drug transactions that did not involve appellant.[2]

---

[1] This section addresses appellant's first and second assignments of error.

[2] During a pretrial motions hearing, the Commonwealth argued that the victim's history of selling marijuana "other than as it relates to sales with [appellant] that go to their relationship" and "the motive of [appellant] for the killing" was irrelevant and thus inadmissible. The court granted the Commonwealth's motion on this point, agreeing that evidence about the victim's past history of selling marijuana to individuals other than appellant was irrelevant and prejudicial.

During argument on the motion, counsel for appellant proffered that Samey would testify that he and the victim had planned to meet and Samey was then robbed by the victim; the only specific testimony that would not be mentioned was the fact that the transaction had involved the sale of marijuana. Thus, the jury would get "99.9% of the picture, just minus the marijuana part." However, the court found that the Commonwealth's assertion was correct—either the Commonwealth would violate the court's order to refrain from mentioning the victim's prior drug transactions, or the jury would "get[] an incomplete unfair sanitized version" of events. The court thus ruled that Samey would not be permitted to testify about the specific incident from February 2015. The court also noted that appellant already "ha[d] two acts of violence in [evidence] the way it is"—the incidents involving the victim's sister and Mubshra Ali.

Also during argument on the motion to exclude Samey's testimony, counsel for appellant stated that Samey was also expected to testify as to the victim's general reputation for violence. The court instructed counsel for appellant to question Samey outside the jury's presence in order to establish a foundation for his testimony. Samey testified that he knew the victim from high school, and when asked what the victim's "reputation for violence was within the school," he replied, "Robbing people, bullying people." The Commonwealth objected to this testimony, arguing that it was not proper reputation testimony because "[r]eputation evidence is what is his reputation in the community for violence and the reputation is either he is or he isn't," and Samey's testimony was about specific acts with unknown individuals. At that point, the court sustained the Commonwealth's objection but allowed counsel for appellant to further question the witness. Counsel for appellant asked Samey what the victim's reputation was, and he replied, "Him just being mean." When asked in what way the victim was known to be mean, he stated, "Like teasing a lot of people, saying hey come with me, let's do this, and people don't want to chill with him because they know what it's going to do to them." The Commonwealth

- 11 -

renewed its objection to Samey's testimony. The court again sustained the objection, finding that this testimony was in reference to "specific acts" and that the witness was only permitted to testify as to the victim's "general reputation in the community for violence." Counsel for appellant finally asked Samey, "Without referencing a specific act, d[id] the victim have a violent reputation," to which he replied in the affirmative.

Before the jury, Samey testified that he knew the victim from high school and that he had a reputation for "being violent and aggressive" among members of the school community.

Appellant challenges two rulings of the trial court regarding Samey's testimony. First, he argues that the trial court erred in prohibiting Samey from testifying about a specific act of violence committed by the victim against him. Second, appellant contends that the trial court erred by excluding evidence that the victim had a reputation "for bullying and robbing."

Generally, "[e]vidence of a person's character or character trait is not admissible for the purposes of proving action in conformity therewith on a particular occasion." Va. R. Evid. 2:404(a). However, an accused claiming self-defense can introduce evidence of prior "acts of violence by the victim of the crime." Va. R. Evid. 2:404(a)(2). "[W]here an accused adduces evidence that he acted in self-defense, evidence of specific acts is admissible to show the character of the decedent for turbulence and violence, even if the accused is unaware of such character." Carter v. Commonwealth, 293 Va. 537, 546 (2017) (quoting Barnes v. Commonwealth, 214 Va. 24, 25 (1973)). In addition to evidence of prior acts of violence, an accused claiming self-defense can introduce evidence of a victim's "pertinent character trait." Va. R. Evid. 2:404(a)(2); see also Lee v. Commonwealth, 188 Va. 360, 363 (1948) ("The accused may show in a homicide case, when he relies upon a plea of self-defense and has supported his plea with some evidence, the reputation or character of the deceased for violence and turbulence."). This evidence is properly introduced via "testimony as to reputation; but a

- 12 -

witness may not give reputation testimony except upon personal knowledge of the reputation." Va. R. Evid. 2:405.

Based on the record, we need not decide whether the trial court erred in excluding Samey's testimony regarding a specific act of violence by the victim or in excluding his testimony regarding the victim's reputation for "bullying and robbing" because any presumed error committed in the exclusion of either was clearly harmless.

In conducting our analysis, we first note that the evidence of appellant's guilt was overwhelming in this case. Hours before his death, the victim was heard arguing on the phone. Shortly before encountering the victim, appellant was "mad" and "angry." At that time, he was seen talking to himself about how the victim could not tell him what to do and about how he did not want to repay the victim. Appellant, in an "aggressive and pretty . . . harsh" tone, complained that the victim was "always . . . bothering him." After arriving at the victim's home, Castedo saw and heard appellant and the victim "talk[ing] about money" behind his car and said it was appellant who was more "loud and aggressive." The men scuffled, and when the victim ran away from appellant and toward his house, appellant ran after him "aggressively." When the victim's sister saw the victim at the back door of his house, he was "gushing blood" from a neck wound. Appellant was within two to three feet of the victim and was holding a bloody knife. The victim's sister also saw blood on appellant's hand before she yelled at him to leave the property. When appellant returned to the car, he was "calmer" but also "really nervous" and "visibly scared" of both the police and the victim. He said he needed a gun to protect himself. Appellant was worried that the police would pursue him and instructed Castedo and Byrd not to say anything to the police. Later, during a brief stop at his house, appellant gave Byrd the knife used in the altercation and then left the house.

Despite having multiple opportunities to offer that he acted in self-defense when interviewed by police the day of the victim's death, appellant refused to admit that he and the victim had a physical altercation and never claimed that the victim had put his hands on his neck. In addition, prior to his interview, appellant asked a police officer at the hospital, "[W]hat would happen if someone committed a very bad crime and before the police found out about it they left the country?" He also specifically asked what would happen if someone fled to Iraq. We find that the evidence in the entire record provided overwhelming support for appellant's guilt.

Turning to each alleged error, we conclude that the exclusion of Samey's testimony regarding the February 2015 ambush and robbery was harmless because of the overwhelming evidence of guilt in the record as noted above. Further, the prejudicial effect of the exclusion of this testimony was lessened by the admission of two other previous acts of violence by the victim. We recognize that our "harmless error analysis . . . [is not] simply a sufficiency of the evidence analysis." Hooker v. Commonwealth, 14 Va. App. 454, 458 (1992). However, the overwhelming evidence of appellant's guilt coupled with other evidence in the record showing previous acts of violence by the victim lead us to conclude that even if Samey's testimony regarding the February 2015 incident had been admitted, "the verdict would have been the same." Campos, 67 Va. App. at 717 (quoting Lavinder, 12 Va. App. at 1006).

We also conclude that the exclusion of Samey's testimony that the victim had a reputation for "bullying and robbing" was harmless in light of the overwhelming evidence in the record. In addition, while Samey was prohibited from testifying as to the victim's reputation for "bullying and robbing," he did testify that the victim had a reputation for "being violent and aggressive." While this testimony was not the exact same as the testimony excluded, it clearly supported appellant's self-defense claim. In fact, in this case, there was no claim that the victim robbed or bullied appellant; therefore, reputation testimony that the victim was "violent and

- 14 -

aggressive" was more supportive to his specific self-defense claim. Again, we conclude the strength of the evidence of appellant's guilt along with the nature of the other reputation evidence admitted show that even if the testimony that the victim had a reputation for "bullying and robbing" would have been admitted, "the verdict would have been the same." Id.

Reviewing the record as a whole, we conclude the exclusion of Samey's testimony regarding a previous act of violence committed by the victim and the victim's reputation for "bullying and robbing" did not affect the jury's verdict and thus was harmless.

### Impeachment of the Commonwealth's Own Witness[3]

In her opening statement, the Commonwealth's attorney told the jury that in the car on the way to the victim's home, while Byrd was on the phone with the victim, appellant yelled, "[t]ell him we're coming, tell him we're coming," at Byrd's phone.

During the Commonwealth's attorney's direct examination of Javier Castedo, the following interaction occurred:

> COMMONWEALTH'S ATTORNEY: Did [appellant] say anything into the phone to [the victim]?
>
> CASTEDO: No, I don't believe so.
>
> COMMONWEALTH'S ATTORNEY: Javier, do you remember talking to police previously about this incident.
>
> CASTEDO: Yes.
>
> COMMONWEALTH'S ATTORNEY: Do you remember saying that [appellant] was screaming, "Tell him we're coming, tell him we're coming."
>
> DEFENSE ATTORNEY: Objection, Your Honor. She's trying to impeach her own witness here. He's already testified he did not say anything, not that he didn't remember. She's trying to impeach her own witness. This is direct examination.
>
> THE COURT: If that's the objection I overrule the objection.

---

[3] This section addresses appellant's third assignment of error.

COMMONWEALTH'S ATTORNEY: Do you remember saying that in the past?

CASTEDO: Yes. Well, he wasn't screaming into the phone but he was telling Tyrice that we were coming. So he wasn't directly talking to [the victim] on the phone. He was talking to Tyrice.

Testifying in his own defense, appellant admitted that while driving to the victim's house his "voice might have increased" and that he said "We're coming. We're coming." He stated that he said this because Byrd was having trouble communicating to the victim that they were on the way to see him.

The Commonwealth's attorney, in rebuttal closing argument, stated that appellant's counsel "made a statement that the witnesses never said that on the way over [appellant] told [the victim] we're coming, we're coming. But I submit to you [Castedo] did say that from the witness stand, and you heard it."

Appellant argues that the trial court erred in overruling his objection to the Commonwealth impeaching its own witness to elicit statements made by appellant in support of the Commonwealth's theory of premeditation. Appellant argues that the Commonwealth's attorney "clearly impeached her own witness by discrediting Castedo's first answer to the question of whether [appellant] had said anything 'into the phone to [the victim].'" Appellant claims the Commonwealth's attorney did not follow the correct procedures for the impeachment of her own witness, as she never claimed surprise by Castedo's first answer, never attempted to declare Castedo hostile or adverse, and never properly refreshed Castedo's recollection.

We need not determine whether the trial court erred in overruling appellant's objection to the Commonwealth's attorney's questioning of Castedo because we find that any potential error was harmless in light of the overwhelming evidence of appellant's guilt in the record, as noted above.

Despite the evidence, appellant argues that the admission of Castedo's testimony about appellant's statement was not harmless because it was important to support the Commonwealth's theory of premeditation, as demonstrated by the fact that appellant's statement was utilized by the Commonwealth's attorney in her opening statement and rebuttal closing argument. We disagree, and conclude that there was other undisputed evidence which allowed the jury to rationally find that appellant acted with premeditation and was therefore guilty of first-degree murder. As noted above, shortly before seeing the victim, appellant was "mad" and "angry" and talked to himself about how the victim could not tell him what to do and about how he did not want to repay the victim. Appellant, in an "aggressive and pretty . . . harsh" tone, complained that the victim was "always . . . bothering him." Castedo saw and heard appellant and the victim "talk[ing] about money" and said it was appellant who was more "loud and aggressive." After the two men scuffled, the victim ran away from appellant and appellant ran after him "aggressively." Appellant was not known to carry a knife and denied ever carrying a knife, yet possessed one during his altercation with the victim. Based upon this evidence, the jury could rationally conclude that appellant had plans to kill the victim on the way to the victim's home, even without Castedo's testimony that appellant yelled, "[t]ell him we're coming, tell him we're coming," when Byrd was speaking to the victim on the phone.

While the Commonwealth did highlight appellant's statement, "[t]ell him we're coming, tell him we're coming," in its opening and closing statements, other evidence supported the Commonwealth's theory of premeditation. Here, based on the record as a whole, it is clear that even without Castedo's testimony about appellant's statement, we can conclude that "the verdict would have been the same." Campos, 67 Va. App. at 717 (quoting Lavinder, 12 Va. App. at 1006). Consequently, any error in the admission of Castedo's testimony was harmless.

## Introduction of Portions of Interrogation Video[4]

In the Commonwealth's opening statement, the Commonwealth's attorney told the jury that it would view appellant's behavior while he was alone in the interrogation room, noting that "Detective Guyton steps out a couple of times during the course of the interview. And [appellant] thinks he's alone and that there's no one there to put on show for anymore, to feign sadness, to feign shock."

During the Commonwealth's case-in-chief, appellant objected to the Commonwealth playing for the jury portions of the interrogation video showing appellant alone in the interrogation room. Appellant argued that his demeanor during this time period was not relevant. The Commonwealth responded that the portions of the video in question were "extremely relevant to [appellant's] state of mind and to show that the statements he's making to the detective are ludicrous." The court overruled the objection, noting that the video segments were "relevant" and "all part and parcel of what [the Commonwealth's attorney] wants to show."

The Commonwealth played the video of appellant's interrogation, but fast forwarded through the segments recorded while Detective Guyton was out of the room. However, the entire interrogation video, with the portions of time during which appellant was alone, was admitted as an exhibit for the jury's review.

The interrogation video shows that around 8:50 p.m. on the day of the victim's death, Detective Guyton left the interview room for about forty minutes. Appellant spent much of that time humming, tapping his feet on the ground, tapping his fingers on the desk, snapping his fingers, and bobbing his head. At one point he tossed a water bottle in the air while whistling, and at another point he laid his head down on the desk and closed his eyes. Guyton returned around 9:33 p.m., appellant said, "Oh shit, I almost fell asleep." Around 9:44 p.m., Guyton

---

[4] This section addresses appellant's seventh assignment of error.

again left the room and after he left, appellant spent several minutes snapping his fingers, bobbing his head, tapping his chest and leg, and fiddling with his handcuff. At 10:01 p.m., appellant snapped, pointed at the camera, and said, "Pow pow." At 10:02 p.m., appellant said, "I didn't do it."

During closing argument, the Commonwealth's attorney told the jury that when Detective Guyton left the interrogation room, appellant was "cool as a cucumber." She further argued that appellant was "not upset. He's not mourning the loss of [the victim]. He's thrilled. He's humming to himself. He's tapping on the table. He's stone cold. That's cold. And you see it on his face when he thinks you're not looking."

Appellant argues that the trial court erred in overruling his relevancy objection to the Commonwealth playing portions of the interrogation video of him alone in the interrogation room.

Based upon our standards for non-constitutional harmless error, we conclude that any alleged error in the admission of portions of the interrogation video was harmless because, as noted above, other evidence of appellant's guilt was overwhelming. Additionally, the nature of the challenged evidence was ambiguous at best, because appellant's demeanor while alone in the interrogation room could be subject to a variety of interpretations. Thus, its probative value was relatively low. Even though appellant's demeanor was mentioned by the Commonwealth in its opening and closing statements, in light of the other evidence of appellant's guilt, we can conclude that "had the error not occurred, the verdict would have been the same." Campos, 67 Va. App. at 717 (quoting Lavinder, 12 Va. App. at 1006).

B. Juror Bias[5]

During *voir dire*, the trial court asked the entire venire panel of prospective jurors,

"[h]ave any of you expressed or formed any opinion as to the innocence or guilt of [appellant],"

with no response from the venire. The court also asked if "any of you aware of any bias or

prejudice against the Commonwealth of Virginia or against [appellant]." Again, there was no

response from the venire.

Following the selection of the jury via *voir dire*, the court instructed the jury,

> Until the case is submitted to you for your deliberations do not
> decide any issue in the case and do not discuss the case with
> anyone. There will be occasional recesses during the trial. During
> the recesses do not discuss the case with your fellow jurors or
> remain within the hearing of anyone who is discussing it. Don't go
> to the scene. Do not make any independent investigation. And do
> not receive any information about the case from the news media or
> the internet.

After the Commonwealth rested its case-in-chief, but prior to the presentation of

appellant's case, the court told counsel that one of the court deputies had informed him that Juror

Albanese

> asked my deputy, "Do you carry a pocket knife?" My deputy said,
> "No," and then [the juror] started asking questions about this knife
> in this case, notwithstanding my admonition not to discuss the case
> with anyone but I guess they figured the deputy is -- the officiality
> around the deputy provides an exception. And specifically asked
> my deputy, "Does this knife open with one hand or two?" At that
> point my deputy did the correct thing and said, "Stop. We're not
> discussing this any more." I'm bringing that to your attention that
> that has happened. I don't see anything disqualifying about it or
> anything that would warrant drastic measures, but you all need to
> know that this happened.

The jury returned a guilty verdict on appellant's first-degree murder charge. During the

sentencing phase of the trial, the Commonwealth's attorney informed the court that a juror had

---

[5] This section addresses appellant's fourth and fifth assignments of error.

- 20 -

approached an assistant Commonwealth's attorney and asked him if he worked in the Commonwealth's Attorney's Office.[6] He replied that he did, and the juror then "engaged him in conversation and sa[id] he ha[d] questions about the prosecutor's office. He [was] happy with public service and he want[ed] to know how many prosecutors there are and, you know, what the funding is, things like that." Before the assistant Commonwealth's attorney could answer these questions, the juror told him that he was currently sitting on a jury in the sentencing portion of the proceeding. The assistant Commonwealth's attorney told him that he could not speak to him if he was currently on a jury. The juror told him, "it's not about the case." The assistant told him that he still could not speak with him, and the juror asked if there was someone else he could speak to. The assistant Commonwealth's attorney told him that he could not speak to anyone in the office until his jury service was completed, but that he could come back another time to talk about the office after the conclusion of the trial. When asked by counsel for appellant if the juror said he was "happy with the job that the Commonwealth's Attorney's Office is doing," the assistant Commonwealth's attorney approached by the juror stated that he thought the juror "was saying he is happy with our legal system" and "more said he was interested in the legal system, not happy one way or the other."

Through *voir dire* of the male jurors, the court discovered that Juror Albanese was the juror that had approached the assistant Commonwealth's attorney. When asked by the court why he spoke with the assistant Commonwealth's attorney, Juror Albanese stated, "I was curious to understand the workings of this building and our judicial system, and I wanted to get a better understanding of what is the size of the Commonwealth's Attorney's Office."

---

[6] The juror had entered the door that was clearly marked "Commonwealth's Attorney's Office."

The court asked counsel if they had further questions of the juror, and counsel for appellant stated that he "fe[lt] in an awkward position to question him too much, because he's going to go back in the jury room and decide my client's fate perhaps."

The court then told the parties,

> I don't know how to say this. I know that neither one of you want to go here, and I have to. His credibility is – I didn't find his – . . . explanation was not persuasive to me. Why would you want to go ask about the workings of the office in the courthouse in the middle of a trial when you've been told, repeatedly, "Don't talk to anybody else?"

The Commonwealth's attorney told the court that she had repeatedly commented that there was one Commonwealth's attorney prosecuting the case, while appellant had three attorneys, and therefore that discrepancy could have been the reason Juror Albanese had asked about the size of the Commonwealth's Attorney's Office. The court stated that sounded like "accurate speculation," but it worried that perhaps the juror voted to convict because he thought the Commonwealth had an unfair disadvantage. The court also stated that it was not "really concerned about the conversation" because it "appear[ed] to be innocuous," rather "[w]hy did he do it" was the court's concern.

The court brought Juror Albanese back for further *voir dire*. When asked again by the court why he went into the Commonwealth's Attorney's Office, the juror stated that he was "impressed with the whole process, the whole structure," and as a taxpayer was interested in the size of the Fairfax County court system and Commonwealth's Attorney's Office. He also testified that he was "not looking to lay any congratulations to [the Commonwealth's attorney]." The court asked Juror Albanese if his interest was motivated by "the fact that . . . the Commonwealth has had one attorney in this trial . . . and they have three?" The juror replied, "No, I don't feel that . . . the Commonwealth was under-represented." He further stated that he

was "sorry that [he] ha[d] caused . . . a delay and an issue that had to be resolved" and that "it was a curiosity."

Following this *voir dire*, the court told counsel, "That all sounds great. The attitude he displayed at first [when] answering my question does not give me a good feeling. I'm not used to people saying, 'Let me explain again, Judge. You didn't seem to understand.'" However, the court again stated that the conversation itself did not "rise to the level of causing any problem."

During this same hearing regarding Juror Albanese's visit to the Commonwealth's Attorney's Office, the parties alerted the trial court that a different juror, Juror Altman, had approached Detective Guyton in the hallway during a break in the detective's testimony earlier in the trial. The juror had told the detective that he was "pleased with his service," and Guyton had responded that he could not talk to him. The parties had not previously brought the contact to the court's attention because, according to counsel for appellant, "independently it didn't seem like much."

At that point, counsel for appellant moved for a mistrial "in light of the disobeyance of the [c]ourt's previous instructions." The court denied the motion but stated that it could possibly reconsider later "depending on what happens."

The jury was able to reach a verdict on sentencing, sentencing appellant to twenty-three years' imprisonment. After the jury was dismissed, the court stated that it normally went back to speak to a jury, but would not with this jury, because "[t]oo much could go wrong."

On March 29, 2017, the day after the trial concluded, the Commonwealth's attorney sent a letter to the court stating that she had received a LinkedIn message that day from Juror Altman stating, "I was a juror on the Dosky trial and just want you to know how much we all admired your work. We are all proud to have you working 'on our side.'"

- 23 -

Appellant filed a motion for a new trial on the ground of juror misconduct. In his motion, appellant argued that the juror contacts with third parties demonstrated an "underlying bias in favor of the Commonwealth held by multiple members of this [j]ury." The court addressed the motion for a new trial at the sentencing hearing, denying it after explaining that the trial "might not have been perfect, but it was certainly fair and . . . as much as it was a problem that a juror did what he did, the fact still remains that the evidence is there. And his misbehavior doesn't change that."

Appellant argues that the trial court erred in denying his motion for mistrial due to juror bias established by three juror contacts with third parties during trial. He further asserts that the court erred in denying his motion to set aside the verdict due to these juror interactions during trial plus the juror's contact with the Commonwealth's attorney the day after the conclusion of trial.

A defendant's right to an impartial jury is guaranteed by the United States and Virginia Constitutions. U.S. Const. amend. VI; Va. Const. art. I, § 8. A juror must be "indifferent to the cause," Spangler v. Ashwell, 116 Va. 992, 996 (1914), and have the ability to "lay aside . . . preconceived views and render a verdict based solely on the law and evidence," Cressell v. Commonwealth, 32 Va. App. 744, 761 (2000). "If [a juror] has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." Lovos-Rivas v. Commonwealth, 58 Va. App. 55, 60-61 (2011) (quoting Spangler, 116 Va. at 996-97).

Appellant challenges the court's denial of his mid-trial motion for mistrial and denial of his motion for a new trial based upon his allegation that certain juror behavior in the case demonstrated bias. We review both of the trial court's decisions under an abuse of discretion standard. "When the issue arises from a mid-trial challenge to a juror's impartiality, we 'will

reverse the trial court's decision only for an abuse of discretion,' applying the same standard of review appropriate to appellate consideration of the trial court's decision to seat a venireperson." Brooks v. Commonwealth, 41 Va. App. 454, 459 (2003) (quoting David v. Commonwealth, 26 Va. App. 77, 80 (1997)); see also Near v. Commonwealth, 202 Va. 20, 32 (1960) ("It is settled that a motion for a new trial on the ground of misconduct of a juror is addressed to the sound discretion of the trial judge, and unless he abuses that discretion, his judgment concludes the matter on appeal.").

Further, our Supreme Court has recognized that

> a mistrial will not be declared automatically upon a showing of juror misconduct, but that the trial judge, in the exercise of a sound discretion, must determine whether remarks made about the case by a juror to persons not jurors demonstrate that prejudice might result. The burden to establish this probability of prejudice is upon the party moving for a mistrial. This view is based upon the universal rule that fraud will not be presumed and upon the reluctance to presume prejudicial misconduct.

Haddad v. Commonwealth, 229 Va. 325, 330 (1985). However, after a jury has been empaneled, if "the impartiality of a juror is subsequently brought into question, it is an abuse of discretion to deny a motion for mistrial if the proponent of the motion establishes the probability of prejudice such that the fairness of the trial is subject to question." Robert M. Seh Co. v. O'Donnell, 277 Va. 599, 605 (2009).

Appellant's motion for mistrial and motion for a new trial were based on four juror interactions that occurred both during and after trial: (1) Juror Altman telling Detective Guyton that he was "pleased with his service" during a break in Guyton's testimony; (2) Juror Albanese asking a court deputy if he carried a pocketknife, then asking questions about the knife in this case, during the Commonwealth's case-in-chief; (3) Juror Albanese entering the Commonwealth's Attorney's Office during the sentencing phase and asking an assistant Commonwealth's attorney questions about how the office functioned; and (4) Juror Altman

sending a LinkedIn message to the Commonwealth's attorney the day following the trial's conclusion, stating, "I was a juror on the Dosky trial and just want you to know how much we all admired your work. We are all proud to have you working 'on our side.'"

While troubling, these interactions as a whole do not demonstrate that appellant has met his burden in "establish[ing] [a] probability of prejudice." Haddad, 229 Va. at 330.

Here, Juror Altman's interactions with third parties, while concerning, do not establish prejudice of a level necessitating a mistrial. Juror Altman's statement to Detective Guyton that he was "pleased with his service" can be viewed as expressing favorability toward the Commonwealth, because Detective Guyton was the lead investigator and an important Commonwealth witness, but likewise could be viewed as an expression of gratitude for the detective's professionality on the witness stand. Further, the statement did not explicitly or implicitly demonstrate a negative bias against appellant, as the statement did not mention appellant or discuss Guyton's evidence itself.

Juror Altman's message to the Commonwealth's attorney, in which he stated that he was proud to have her working "on our side," also does not demonstrate bias on the part of the juror. Here, the timing of the juror's message is crucial to our determination. Juror Altman communicated with the Commonwealth's attorney a day after the trial concluded, and therefore his statement cannot be viewed as an expression of his bias during the period when he was deliberating over appellant's guilt or sentence.

We also conclude that Juror Albanese's interactions with third parties, while troubling, do not establish prejudice creating a doubt as to the fairness of the trial. Juror Albanese first asked a court deputy if he carried a pocketknife and then questioned him about the knife in the case at hand. This interaction does not demonstrate the juror's bias against appellant. Rather, it merely

shows his curiosity about how the knife would have been used against the victim, which, although an improper question for the deputy, was not a demonstration of bias.

Juror Albanese's interaction with an assistant Commonwealth's attorney in the Commonwealth's Attorney's Office also does not establish that the juror held a bias against appellant. While we note that a juror's deliberate visit to the prosecuting entity's office during the sentencing phase of a trial is certainly unusual and somewhat odd,[7] we agree with the trial court's conclusion that the conversation the juror had with the Commonwealth's attorney was "innocuous." Further, the assistant Commonwealth's attorney characterized the juror's questioning as "saying he is happy with our legal system[,] . . . he was interested in the legal system, not happy one way or the other." The juror did not comment on appellant or the evidence; rather, he asked general questions related to the functioning of the Commonwealth's Attorney's Office. While the court made some negative comments as to the juror's credibility in his explanation of his behavior, it stated that the conversation that occurred did not "rise to the level of causing any problem." In light of these considerations, we conclude that the juror's visit to the Commonwealth's Attorney's Office did not demonstrate bias against appellant.

In this case, the jurors in question neither expressed to a third party any animus toward appellant or toward criminal defendants in general, nor stated whether they had concluded that appellant was guilty or innocent. The two jurors' interactions with third parties did not indicate that they no longer remained impartial as established by their answers to the inquiries made

---

[7] However, this visit was not technically in violation of the court's preliminary instructions to the jury, as it does not appear that the juror discussed the case with the assistant Commonwealth's attorney or attempted to make any independent investigation at the office. The other three communications before us implicate a form of juror misconduct as they can be broadly construed as discussions regarding the case, in violation of the court's preliminary instructions.

during *voir dire*.  Therefore, we conclude that the trial court, after reviewing the conduct of the jurors, did not err in denying appellant's motion for mistrial and motion for a new trial.

C.  Involuntary Manslaughter Instruction[8]

Counsel for appellant asked the court to provide the jury with an instruction on involuntary manslaughter.  Counsel argued that appellant testified repeatedly that he did not intend to inflict the fatal wound on the victim, and thus the jury could find that the killing was careless or wanton but culpable.  The Commonwealth argued that there was no evidence to support an involuntary manslaughter instruction because there was no testimony about negligence or appellant's unlawful performance of a lawful act.  The court sustained the Commonwealth's objection to the involuntary manslaughter instruction.

The trial court instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter.  The jury also received instructions on the defenses of accident and self-defense.

Appellant argues that the trial court erred in refusing to give the jury an involuntary manslaughter instruction.  He contends that viewing the evidence in the light most favorable to him, there was more than a scintilla of evidence to demonstrate that:  (1) he was engaged in the lawful act of self-defense; and (2) during this lawful act, while he never intended to kill the victim, he used an improper amount of force to repel an attack.  Thus, appellant maintains, his actions fall within the definition of involuntary manslaughter.

Based upon the instructions that were given by the trial court, we conclude that any error in refusing to give an involuntary manslaughter instruction was harmless, pursuant to this Court's decision in Turner v. Commonwealth, 23 Va. App. 270 (1996), aff'd, 255 Va. 1 (1997). In that case, we held that

---

[8] This section addresses appellant's sixth assignment of error.

> where the reviewing court is able to determine that the trial court's error in failing to instruct the jury could not have affected the verdict, that error is harmless. Such a determination can be made where it is evident from the verdict that the jury would have necessarily rejected the lesser-included offense on which it was not instructed.

Id. at 276 (citation omitted).

In Turner, this Court concluded that the trial court erred in refusing to give a voluntary manslaughter instruction; however, that failure was harmless because the jury had rejected second-degree murder in reaching its verdict of first-degree murder. Id. at 277. By rejecting the lesser-included offense of second-degree murder, "the jury found beyond a reasonable doubt that appellant acted not only maliciously, but also willfully, deliberately, and premeditatedly." Id. Because "premeditation and reasonable provocation cannot co-exist . . . [the jury] necessarily rejected the factual basis upon which it might have rendered a verdict on the lesser-included offense of voluntary manslaughter." Id. at 277-78.

Likewise, here, the jury was instructed on both first-degree and second-degree murder and convicted appellant of first-degree murder. The jury rejected the lesser-included offense of second-degree murder, and in doing so must have "found beyond a reasonable doubt that appellant acted not only maliciously, but also willfully, deliberately, and premeditatedly." Id. at 277. By contrast, involuntary manslaughter "has two elements: (1) the accidental killing of a person, contrary to the intention of the parties; and (2) the death occurs in the defendant's prosecution of an unlawful but not felonious act, or in the defendant's improper performance of a lawful act." Commonwealth v. Gregg, 295 Va. 293, 297 (2018) (quoting West v. Dir., Dep't of Corr., 273 Va. 56, 63-64 (2007)). Considering the jury's verdict of first-degree murder, in which it found that appellant acted with premeditation and malice, the jury necessarily rejected appellant's theory that his actions were accidental. Because the jury, in its verdict of first-degree murder, rejected the factual basis upon which it might have rendered a verdict on the

lesser-included offense of involuntary manslaughter, any error in failing to instruct on involuntary manslaughter was harmless.

### III.  CONCLUSION

For the reasons above, we hold that if the trial court erred in its determinations regarding the exclusion or admission of evidence, any error was harmless.  Further, the court did not err in denying appellant's motion for mistrial and motion for a new trial based on juror conduct. Finally, we conclude that any error in refusing to give an involuntary manslaughter instruction was harmless.  Accordingly, we affirm.

<u>Affirmed.</u>